**AFFIRMED AS MODIFIED and Opinion Filed June 25, 2024**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-23-00848-CR

**DARWIN SHUN TAYLOR, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 2**
**Dallas County, Texas**
**Trial Court Cause No. F21-59590**

## MEMORANDUM OPINION

Before Justices Reichek, Goldstein, and Garcia
Opinion by Justice Garcia

Appellant Darwin Shun Taylor appeals his conviction for arson, arguing in a single issue that the evidence is insufficient to support his conviction. We modify the judgment to correct some errors and affirm the judgment as modified.

### I.   BACKGROUND

Appellant was indicted for arson with intent to damage a habitation. The indictment included two enhancement paragraphs. Appellant pleaded not guilty and not true as to the enhancements.

A jury found appellant guilty of arson and found that he used a deadly weapon during the commission of the crime. Punishment was tried to the bench, and after hearing evidence the trial judge found the enhancement paragraphs true and sentenced appellant to thirty years in prison.

Appellant timely appealed.

## II. ANALYSIS

In a single issue on appeal, appellant challenges the legal sufficiency of the evidence to support his conviction.

### A. Applicable Law and Standard of Review

As relevant to this case, a person commits arson if he starts a fire with intent to destroy or damage a habitation knowing that the habitation was within the city limits of an incorporated city or town. *See* TEX. PENAL CODE ANN. § 28.02(a)(2)(A).

Evidence is legally sufficient to support a conviction if any rational juror could have found the essential elements of the crime beyond a reasonable doubt. *McPherson v. State*, 677 S.W.3d 663, 664 (Tex. Crim. App. 2023). We consider the evidence in the light most favorable to the verdict, and we may not reweigh the evidence, substitute our judgment for the jury's, or act as a thirteenth juror. *Id*. This standard gives full play to the jury's responsibility to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id*.

**B. Evidence**

**1. General Evidence About the Fire**

At trial, the State adduced evidence that on the night of October 4, 2021, there was a fire at a duplex on Elsie Faye Heggins Street in Dallas, Texas. The duplex had a small porch facing the street, with about four steps leading from the porch to ground level. The unit on the right side of the duplex, viewed from the street, was occupied by Ola Ruth Daniels and her adult son Gregory Daniels. Because Ola had no legs and used a wheelchair, a ramp covered the right side of the porch steps. Gregory testified that unit on the left side of the duplex was occupied by "Mr. Lee" and his daughter Delilah. Gregory also testified that Delilah was a prostitute.

Ola testified that on the night of October 4, 2021, she was sitting in her unit's front room watching television when she saw a fire outside on the porch through an open front window. Within seconds, her curtains caught on fire. She screamed for Gregory, who was in the unit's back room. He did not have time to put Ola in her wheelchair but instead dragged her from her chair, out the front door, and down the wheelchair ramp. The fire was already at the front door by that time, and Ola suffered burns on her neck and her right arm. Gregory also testified about these facts, and his testimony generally matched Ola's. Neither Ola nor Gregory saw who started the fire.

Kevin Gallegos, an arson investigator with Dallas Fire Rescue, testified that the fire department responded to a call about this fire "roughly just before midnight."

Dallas firefighter Michael Tomlinson testified that he and other firefighters arrived at the scene within about two minutes of the call about the fire. The front room of the Danielses' unit was fully engulfed in fire, but the outside was not on fire. Tomlinson was the first person to enter the Danielses' unit, and he hosed down the floor so that the firefighters could push further into the residence. He testified, "There seemed to be an accelerant on the floor, and it splashed onto my legs. My pants caught on fire. My gloves caught on fire. My shoulder." Although he had fought hundreds of fires, he had never caught on fire before. Based on his training and experience, he believed there was an ignitable liquid in the house.

Gallegos arrived at the premises when it was still "a hot fire," and he investigated the scene. He collected some debris to be tested for flammable liquids. Based on his training and background, Gallegos testified that it looked like the fire started "right below the front living room window between that and the doorway." He further testified that there was no evidence that the fire was accidental or natural. His conclusion was that the fire was an "incendiary fire," which means "a set fire."

Forensic scientist Aaron Lewis testified that he tested some of the debris from the fire, and he concluded that no "ignitable liquids" were detected. He further testified that it was possible that ignitable liquids were used but were not detectable in the debris because the liquids entirely burned up in the fire or because the water used to fight the fire washed all of the liquids away.

## 2.     Evidence About Appellant's Conduct

Dallas police officer Rebecca Glass testified that on October 4, 2021, she responded to a traffic accident that occurred at around 8:47 p.m. Appellant was one of the drivers involved in the accident, and his girlfriend Delilah Andrews was his passenger. The vehicles involved in the accident were towed away, and the police transported appellant and Andrews in separate vehicles to Andrews's address "on Elsie Faye." During the ride, appellant told Glass that appellant and Andrews had been dating about six years. Glass testified, "[Appellant] asked me if my future husband would cheat on me and then started to imply that he had seen us at a restaurant and saw my husband talking to another female." When asked whether appellant seemed to be concerned about cheating, Glass answered, "A little bit, yeah." On cross-examination, Glass said that appellant also mentioned an episode of the television show "Cheaters." Glass also agreed with defense counsel that she and appellant were "having a lighthearted conversation to pass the time." A video from Glass's body camera showed that the police dropped appellant off right at 10:00 p.m.

Gregory Daniels testified that on October 4, 2021, before the fire broke out, he was visiting Lee and watching television in the front room of Lee's unit when the police dropped Delilah Andrews and a man off at the duplex. Gregory did not know the man's name at the time, but he identified appellant as the person who was dropped off with Andrews. Appellant and Andrews went to the back room of Lee's

–5–

unit, and at some point Gregory went back to his adjacent unit to get ready to go to work. He showered and was getting dressed when Ola yelled at him about the fire.

Witness Rodney Hicks testified that he lived in the duplex next door and to the left of the duplex where the fire broke out. On the night of the fire, he saw appellant leaning against Hicks's pick-up truck, which was parked between the two duplexes. Hicks and appellant had a brief conversation about Hicks's truck, and afterwards appellant started walking from the side of the duplex towards the front. Hicks testified, "[I]t looked like he [appellant] had something in his hand with light," and appellant sat on the porch of the duplex where the fire later broke out. Then Hicks testified, "Well, I seen him walk from the side of the house, looked like something alight in his hand? [sic]" When the State's attorney asked Hicks what he meant by "something alight," he answered:

> I don't know if it was one of them candle things what you keep the food warm or something. I don't know. I can't exactly see what it was, but he had something light in his hand. He's sitting down on the porch, and there was a light.

And when the State's attorney pressed Hicks further, he clarified that the light was a fire of some kind:

A. I don't know what it is, but I seen some fire in his hand.

Q. But there was fire?

A. Yeah.

Q. Definitely flame?

A. Yes, sir.

Q.     How confident are you about that?

A.     I'm confident because he sat down on the porch with it.

Hicks later testified that "he set it down right beside him." Hicks further testified that he had a good look at the front porch and no one else was on the porch with appellant; moreover, nobody was out walking around the neighborhood. Hicks then shut his door, and when he looked outside again about ten minutes later, "the house was blazing." Hicks also testified that it "wasn't even 10, 15 minutes" from the time he shut his door to the time he looked outside again and saw the fire. He also saw appellant on the other side of the street, watching the fire burn. He described appellant's demeanor as "kind of calm."

Gregory Daniels testified that after he pulled his mother from the burning building, he saw a man sitting across the street with a gas can. Hicks indicated to Gregory that the man across the street had started the fire, and Gregory crossed the street towards the man. When Gregory did that, the man stood up and started walking. Gregory saw that the man "had kind of a crazy look in his eyes" and that it looked like "he was high on something." At this point in his testimony, Gregory identified the man as appellant. He testified that appellant walked towards a gas station, and Gregory followed him, asking him why he had set the house on fire. Appellant told Gregory to get away and denied setting the fire. He was carrying a yellow gas can in his hand. Gregory followed appellant as far as a traffic light, at

which point Hicks pulled up in his truck and told Gregory to go back to his mother. Gregory did so, and Hicks followed appellant to a gas station.

Hicks testified that he saw Gregory cross the street and confront appellant. Then Hicks got into his truck and followed appellant, who had a white bag and a gas can. At some point, Hicks passed appellant, pulled into a gas station, and parked. He also called the police. Then appellant arrived at the gas station and went inside. Hicks waited for the police to arrive, and when they did, Hicks told them to go into the gas station. He was still there when they "got him."

Detective Darren Burch of the Dallas Police Department testified that at about 11:40 p.m. on the night of the fire, he and a trainee were dispatched to the fire and then changed course when they received word that a witness was following a potential suspect to a gas station. Burch and the trainee went to a Valero gas station, and Burch met the witness, who described the suspect. Burch then went inside and asked appellant if he had a gas can. Appellant said he did not have a gas can, but he had his tools, and he pointed to "a yellow gas can or Pennzoil can full of tools." The trainee searched appellant and found a lighter. Then appellant was taken into custody.

Arson investigator Gallegos testified that he and the attorneys tested the lighter that was collected from appellant and "it did light."

## C.    Application of the Law to the Facts

According to appellant's issue statement, he challenges the sufficiency of the evidence to prove "that he intentionally started the fire." Although the argument section of his brief appears to be limited to attacking the sufficiency of the evidence that he started the fire, we will construe his brief liberally and assume that he intends to challenge both the actus reus and the mens rea elements of arson.

We address the actus reus first. Appellant argues that the evidence in this case shows no more than that he was present in the vicinity of the fire shortly before it started, and he contends that evidence of mere opportunity to commit a crime is insufficient. He also argues that the State produced effectively no evidence of motive, discounting the evidence of appellant's conversation with Officer Glass about cheating because Glass agreed that the conversation was lighthearted and because appellant did not know the Danielses, who were the principal victims of the fire. And he argues that although he was seen on the duplex's porch with some sort of flame, the fire did not originate where he was sitting.

The State responds that the evidence is sufficient to allow a rational juror to find beyond a reasonable doubt that appellant started the fire.

We agree with the State. The evidence does not show merely that appellant was present in the vicinity of the fire both before and after it started. Rather, the jury heard evidence that only ten minutes before the fire began, appellant was present in the immediate vicinity of the fire's apparent origin point with a fire or flame of some

kind in his hand. Although appellant denies that the fire originated in the area where he was seen on the duplex porch, we disagree. The evidence showed that the porch was small, and the apparent origin of the fire—the area between the Danielses' front window and front door—was only a few feet from where Hicks testified that he saw appellant sitting with a flame. And Hicks testified that no one else was in the area only ten minutes before the fire was burning strongly enough to be visible to Hicks from his residence next door. Finally, there was evidence that appellant had a working lighter in his possession when he was arrested shortly after the fire began. And although we agree with appellant that the State's evidence of appellant's possible motive for the crime—jealousy arising from knowledge or a belief that his girlfriend was a prostitute—was not particularly strong, "motive is not an essential element of a crime." *Bush v. State*, 628 S.W.2d 441, 444 (Tex. Crim. App. 1982). We conclude that the other evidence, taken as a whole, went beyond proof of mere opportunity to commit the crime and that a reasonable juror could conclude beyond a reasonable doubt that appellant started the fire in question.

We likewise conclude that the evidence is sufficient to support the mens rea element of arson. The offense required proof that appellant started the fire with intent to damage or destroy a habitation. *See* PENAL § 28.02(a)(2). The jury could reasonably infer that appellant knew the duplex was a habitation from the evidence that his girlfriend and her father lived there and that he visited their unit shortly before the fire. *See id*. § 28.01(1) (defining "habitation"). And the jury could

reasonably infer that appellant ignited a flame, took it to the front porch of the duplex, and used it to set the duplex on fire. Intent can be inferred from a person's acts, and the law presumes that a person intends the natural and probable consequences of his voluntary acts. *Farrell v. State*, 837 S.W.2d 395, 399 (Tex. App.—Dallas 1992), *aff'd*, 864 S.W.2d 501 (Tex. Crim. App. 1993). Thus, the jury could reasonably infer that appellant intended to damage or destroy the duplex as the natural and probable consequence of setting it on fire. Additionally, firefighter Tomlinson's testimony supported an inference that a flammable liquid was present on the floor of the Danielses' front room at the time of the fire, which suggests that whoever set the fire intended to damage or destroy the duplex.

For all these reasons, we conclude that the evidence was sufficient to support the challenged elements of arson, and we accordingly overrule appellant's sole issue on appeal.

### III. ERRORS IN THE JUDGMENT

We notice some clerical errors in the judgment and correct them sua sponte. *See* TEX. R. APP. P. 43.2(b); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd) (en banc).

The judgment is entitled "Judgment of Conviction by Court—Waiver of Jury Trial." This is incorrect, so we modify the title to read "Judgment of Conviction by Jury." We also modify the body of the judgment to add the notation "Punishment Assessed by the Court."

–11–

Additionally, the judgment recites "N/A" in the blank for "Findings on Deadly Weapon." This is incorrect because the jury found that appellant used a deadly weapon—fire—in the course of committing the crime. Accordingly, we change the notation "N/A" to "Yes, fire." *See* TEX. CODE CRIM. PROC. ANN. art. 42A.054(c), (d); *Davidson v. State*, No. 05-20-00181-CR, 2021 WL 1438305, at *2 (Tex. App.—Dallas Apr. 16, 2021, no pet.) (mem. op., not designated for publication).

## IV. DISPOSITION

We modify the trial court's judgment as discussed above and affirm the judgment as modified.

/Dennise Garcia/
DENNISE GARCIA
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
230848F.U05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

DARWIN SHUN TAYLOR,
Appellant

No. 05-23-00848-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District
Court No. 2, Dallas County, Texas
Trial Court Cause No. F21-59590.
Opinion delivered by Justice Garcia.
Justices Reichek and Goldstein
participating.

Based on the Court's opinion of this date, the judgment of the trial court is
**MODIFIED** as follows:

We change the title of the judgment to "Judgment of Conviction by
Jury."

We add the notation "Punishment Assessed by the Court."

In the blank labeled "Findings on Deadly Weapon," we delete "N/A"
and replace it with the words "Yes, fire."

We **AFFIRM** the trial court's judgment as modified.

Judgment entered June 25, 2024.

–13–